## JAMES MARSHALL, Appellant, v. MARTHA G. MARSHALL, Respondent.

*Marriage — validity of — how determined — Defendant, against whom a divorce has been granted on account of his adultery, cannot marry again — effect of marriage solemnized in State where such marriage is lawful — Contempt — power of court to prevent party guilty of, from taking any aggressive proceedings in an action.*

If citizens leave their own country and contract a marriage abroad, such marriage being forbidden by the law of the country of their residence, but allowed by the law of the country where it is contracted, and being celebrated with an intent to resume, and followed by an actual resumption of, their old residence, the validity of the contract is to be determined by the law of the domicile of the parties. (Per Westbrook, J.)

In 1858, Elizabeth Marshall, who had been married, prior to that time, to the plaintiff herein, procured, in this court, a judgment of divorce against him, for adultery committed by him, the decree containing the clause prescribed by the statutes of this State, forbidding the present plaintiff from contracting a second marriage during the lifetime of the said Elizabeth.

In 1866, the parties to this action, both of them then residing in this State, were married in the State of Pennsylvania, they going into that State for the simple purpose of being united in marriage, with the intent of immediately returning to and residing in this State. At the time of such marriage, the said Elizabeth was still living. In this action, brought by the plaintiff to procure a divorce, on the ground of the adultery of the defendant, the court refused an application on the part of the plaintiff to settle the issues therein to be tried by a jury. On appeal from such order. *Held*, that the marriage, entered into by the parties to this action, in the State of Pennsylvania, was prohibited by the laws of this State, and was absolutely void. (Daniels, J., dissenting.)

As the plaintiff disobeyed the order of this court, in contracting the second marriage, and was thereby guilty of a contempt, it was a proper exercise of the judicial discretion of the court, to refuse to relieve him from the very contract which he had perfected contrary to its mandate. If he has incurred obligations to another by his disobedience to the court, he should be allowed to relieve himself as best he can. (Per Westbrook, J.; Daniels, J., *contra*.)

Appeal by plaintiff from an order of a Special Term of the Supreme Court, refusing, on his application, to settle issues in the cause, to be tried by a jury.

*Ira Shafer*, for the appellant.

*C. W. Sandford*, for the respondent.

WESTBROOK, J. :

The pleadings in this cause admit that the plaintiff, prior to his alleged marriage with the defendant, had been married to one Elizabeth Marshall, who, in the year 1858, by the judgment of this court, procured against the present plaintiff, a judgment of divorce, for adultery committed by him. The decree in that cause contained the clause prescribed by the statutes of this State, permitting the said Elizabeth to marry again, but forbidding the present plaintiff from contracting a second marriage during the lifetime of the said Elizabeth. The pleadings further concede that the parties to this action, they both then residing in this State, were, on the 20th day of September, 1866, married at Susquehanna, in the State of Pennsylvania. After the marriage, the parties returned to this State, and resided therein. The defendant avers that the plaintiff's object in going to Pennsylvania to be married, was to avoid an indictment for bigamy, to which he would, as she alleges, have been liable if the marriage had been contracted here. The plaintiff, whilst denying this to have been his object, admits that the ceremony was performed in the State of Pennsylvania, to which they went for the purpose of contracting the obligation of marriage, and declares that they, "at the time of the said intermarriage, were, and from the time of the said intermarriage, have been, * * * and now are inhabitants of this State."

After the parties to this suit had become, as it is alleged by the plaintiff, husband and wife, they lived together as such until about July, 1873, when the plaintiff, claiming the marriage to be a legal and valid one, commenced this action to be relieved and freed from its obligations, on account, as he declares, of the adultery of the defendant. The cause being at issue, a motion was made at the Special Term for issues to be tried by a jury, and denied. Judge DONOHUE, who held the term, deciding that a citizen of this State, who, in contempt of its laws and its judicial decree, had contracted a second marriage, had no standing whatever in the court, for the purpose of being relieved from obligations which had been assumed contrary to the injunctions of such laws and such decree. The plaintiff, appealing to this court from such order, presents two questions for adjudication : First. Was the marriage with the defendant a legal and valid marriage ? Second. If it was, has the

plaintiff, who disobeyed the judgment and decree of a court of competent jurisdiction, any standing whatever in that court, when he comes therein and asks to be relieved from obligations which he has assumed contrary to its express command? In the discussion of these questions, it will be observed that both parties, at the time of the alleged marriage, were residents of this State, owing allegiance to its laws. When they left its territory for Pennsylvania, and had the marriage ceremony there performed, it was (as must be assumed from their immediate return) with the intention to make this State their domicile; and, although it may be true that the husband did not fear " an indictment for bigamy " if the ceremony was performed here, and which he had no reason to fear,* still, from the express averments of the complaint, it is evident that while residing here they went into another State for the simple purpose of being united in marriage, with the intent of immediately returning and enjoying the protection of the laws of this commonwealth. And it must be further noticed that we are not ·(as this appeal is by the husband from an order made on the objection of the wife) to .consider what legal remedy the defendant may have, if her allegation is true, that she contracted the marriage in ignorance of the plaintiff's condition as to the former one, but only and solely whether the plaintiff has contracted a legal marriage which *he*, for any alleged misconduct of the defendant, may ask this court to annul.

The validity of a marriage like the present, has been an open question in this State. In *Cropsey* v. *Ogden* † JOHNSON, J., says : " It is not necessary for us to consider what would have been the effect of a marriage celebrated out of this State. No such question was presented in the case." In *Haviland* v. *Halstead*,‡ DAVIES, Ch. J., says : " The question is not here, whether a marriage contracted in another State, and solemnized there between these parties, would be a legal and valid marriage here, but whether, in effect, this plaintiff, a party to an illegal and void contract by the laws of this State, can, in effect, enforce it here." It is true that SMITH, J. (pages 646 and 647), in the same case, says : " It may be assumed, that if a marriage had taken place between the parties in New Jersey, in pursuance of their contract, such marriage would have been

* People v. Hovey, 5 Barbour, 117.     † 11 N. Y., 228.     ‡ 34 N. Y., 643.

recognized and treated as valid by the courts of this State, even although the parties had gone into New Jersey with intent to evade the laws of this State;" but this doctrine has never been so held in this State. In support of this statement, the learned judge cites several Massachusetts cases and Story on Conflict of Laws. It will be shown hereafter that this is not now the law of Massachusetts, and that in the most recent edition of Judge STORY's work, a marriage like the present is declared to be void. As the question, then, is as yet unadjudicated here, let us see what statutes we have for our guidance. First: A marriage contracted by a person situated as is this plaintiff, is forbidden. " Whenever a marriage shall be dissolved, pursuant to the provisions of this article, the complainant may marry again during the lifetime of the defendant; but no defendant convicted of adultery, shall marry again, until the death of the complainant." * Second : But not only is such a marriage forbidden, but another provision,† reiterating the forbidding, declares : " Every marriage contracted in violation of the provisions of this section, shall, except in the case provided for in the next section, be absolutely void." The exception relates to a marriage contracted by a person whose husband or wife shall have absented himself or herself for the space of five successive years without being known to such person to be living during that time." I am aware that it is argued that our statutes are fully satisfied by a construction which limits their prohibition and declaration to a second marriage contracted within this State, and that our legislature did not intend to pronounce one void which was celebrated beyond that limit. In answer to this position, it is insisted that, however plausible the suggestion is, it involves consequences so grave that courts should never adopt it, and thereby impute an intent to our law makers, to do that which the moral sense condemns. If the assumption be true, that the legislature of New York only intended to declare the second marriage void when the same took place within its State lines, then it must also be assumed that they intended to permit a party, divorced for his or her adultery, to go beyond these limits and marry again, whilst the former husband or wife was living, and that this was done when its evi-

* Vol. 2, Edmonds' edition of Statutes, page 152, section 49.

† Same volume of Statutes, page 144.

dent effect, as could be plainly seen, would be the destruction of the system of marriage and divorce which they had created. Will it be seriously argued that this was intended? That our legislature really designed, when either party to the marriage relation desired to sever that tie and contract another, to place every facility within easy reach so to do, and to tempt that party to sin to accomplish the purpose? The divorced citizens of New York, who have sought other States as a residence to dissolve a contract, over which, for the causes assigned, our courts had no power, have certainly been subjected to a useless and unnecessary expense, if our laws are to be construed in accordance with this view of legislative intent. Why did not these persons commit an open act of adultery, and, when freed in this State by a decree of divorce granted for that act, cross over into New Jersey or Pennsylvania, celebrate there a second marriage, and at once return to our State to enjoy its advantages? This, it is argued, would be all legal and proper, and just what was intended. Can a construction which imputes such an intent be sound? Its statement is the best answer.

But again: That portion of our statute, before quoted, which declares a second marriage "absolutely void," has been construed by the Court of Appeals of our State, in *Cropsey* v. *Ogden*.* In speaking of the first marriage, Judge JOHNSON † says: "It is not necessary that the prior marriage should have taken place *in this State*, or after the statute took effect. A marriage at any time and *any where*, answers the requirement of the statute." And again,‡ he says: "The prohibition then relates to the case of either party to a marriage, whenever and *wherever* contracted, both the parties to which are living, and prohibits either party to contract a second or other subsequent marriage during the lifetime of the other, except in certain cases specified." If the legislature, in the sections of the statute referred to, was speaking only of marriages in this State, then this decision seems unsound. There is no more limitation upon the place of the second marriage, than there is upon that of the first, and the construction which makes the one broader than the other, must add words which are now absent. Says the statute: § "No second, or other subsequent marriage,

---

* 11 N. Y., 228.                  † Page 233.                  ‡ Page 234.

§ 2d vol., Edmonds' edition, page 144, sec. 5.

shall be contracted by any person, during the lifetime of any former husband or wife of such person; " and if contracted, except in two specified cases, of which this is not one, it shall be " absolutely void." It would be difficult to use language more comprehensive; " no second or other subsequent marriage shall be contracted ; " it covers all space, and reaches as far as the mandate could be made effectual. Having solemnly said that " *no* second or other subsequent marriage " should be contracted, and in no wise limited the force of the prohibition, the interpolation of the words, within this State, is not justified by any sound rule of construction, and involves consequences too grave and serious to be tolerated.

We assume, then, that so far as it is possible for this State to protect itself against a marriage, such as this plaintiff has contracted, by the force of express legislation, it has so done; and if the courts of this sovereignty are bound to respect and hold valid, that which its own legislature has declared " absolutely void," and to so hold in favor of one of its own citizens, who, at the time he did the forbidden act, as such citizen, owed to its laws allegiance and obedience, then it may well be doubted whether it is able to protect its own morals, or the sanctities of the married state, within its own limits. Nay, it is a matter of no doubt whatever, for if the principle, contended for by the plaintiff in this cause, is sound, then all marriages depend upon the will of the parties who have assumed these obligations, and new alliances can be again contracted, and those ties again sundered, as may suit the will or caprice of either. This result could never have been intended, and it is therefore held that our statute forbids every second marriage, and the limitation, if any there be, is one of power only, so far as it *can* reach, it must reach and be applied. We do not now discuss the question whether, if the plaintiff had removed to Pennsylvania and become a *bona fide* citizen of that State, and, whilst so residing there, had contracted marriage, and, after such marriage, had returned to this State, we should have been compelled to acknowledge the legality and validity of the act. That issue is not before us, and upon it no opinion is expressed. The courts of New York are now dealing with one of its own citizens, who has never renounced allegiance to its laws, and who, whilst residing here, crossed its boundary into

a neighboring State, for the purpose of entering into a contract which should, despite our statute prohibition, be executed here. Such an act, declared "absolutely void" by our statutes, as we have shown, cannot, as is earnestly believed, possibly be held valid by our courts; and such a decision would be contrary to right, reason and sound morals, and to carefully considered cases.

It is true that at one time, marriages, such as has been contracted in the case before us, have been held good in Massachusetts,* but it seems to have been so held, when the statutes of that State simply prohibited them, without declaring them void when contracted. Since those decisions were made, however, that State has declared by express enactments, that marriages contracted by residents thereof, under the same circumstances with the present, in another State or country, shall be deemed void; † and the validity of that statute has been recognized by its courts. ‡ A well known Massachusetts author (Bishop), in his work on marriage and divorce, whilst maintaining that marriages like the present, when simply forbidden, must be treated as valid, if legal in the State where contracted, also admits § that "this rule, like other common-law rules, is subject to the legislative control," and that it has been so controlled "in Massachusetts   *   *   * since the contrary point was decided by its courts." Of the soundness of this doctrine, there can be, it seems to us, very little question, unless each State is prepared to surrender its own sovereignty, and place its laws regulating marriage relations among its own citizens, entirely at the mercy of other States or countries. New York has not only forbidden such a marriage as the plaintiff has contracted, but has pronounced it, as we have previously endeavored to show, "*absolutely void.*" The provisions of our statutes are more general and far reaching than those of Massachusetts. The latter simply make void a marriage contracted by a resident of that State in another in fraud and evasion of its prohibition, whilst ours has declared it "absolutely void," without regard to the intent,

* Medway v. Needham, 16 Mass., 157 ; West Cambridge v. Lexington, 1 Pickering, 506.

† R. S. of Mass., chap. 75, section 6.

‡ Sutton v. Warren, 10 Metcalf, 451; Commonwealth v. Hunt, 4 Cushing, 49. See opinion of DEWEY, J., pages 50, 51.

§ 369, vol. 1, 5th edition.

and without regard to the locality of its celebration. If the Massachusetts statute is binding upon its courts, so is ours upon us; and if the cases, decided in that State prior to its present statute, have any authority here, surely those which sustain its more recent legislative enactment, making such marriages null and void, should cause our courts to follow our own statute declaration, and pronounce this marriage (as to the plaintiff at least), in the words thereof, "absolutely void."

This principle has also been decided in the House of Lords, in England, in *Brook* v. *Brook.** In that case,† CAMPBELL, Lord Chancellor, said: " There can be no doubt of the general rule, that a foreign marriage, valid according to the law of the country where it is celebrated, is good everywhere. But, my lords, while the forms of entering into the contract of marriage are to be regulated by the *lex loci contractus,* the law of the country in which it is celebrated, the essentials of the contract depend upon the *lex domicillii,* the law of the country in which the parties are domiciled at the time of the marriage, and in which the matrimonial residence is contemplated. Although the forms of celebrating the foreign marriage may be different from those required by the law of the country of domicile, the marriage would be good everywhere. But if the contract of marriage is such in essentials as to be contrary to the law of the country of domicile *and is declared void by that law,* it is to be regarded as void in the country of domicile, though not contrary to the law of the country in which it was celebrated. This qualification upon the rule, that a marriage valid where celebrated is good everywhere, is to be found in the writings of all eminent jurists who have discussed the subject." It is claimed, however, that this opinion of Lord CAMPBELL, which was sustained by the House of Lords of Great Britain, has no application to the case before us. It is submitted in reply that it decides the very point at issue. The question in *Brook* v. *Brook,* was in reference to the validity of a marriage with a deceased wife's sister, contracted by British subjects in Denmark, who, after the rite had been performed in that country, returned to England to reside. Such a marriage, though pronounced incestuous by the law of England, was not so in Denmark, nor was it

* 7 Jurist, 422.	† Page 423.

forbidden by the common law of civilized nations; it was because the law of England forbade it, that objection was made to its validity. The exact question to be determined was : If citizens leave their own country and contract a marriage abroad, such marriage being forbidden by the law of the country of their residence, but allowed by the law of the country where it is contracted, and being celebrated with an intent to resume, and followed by an actual resumption of, their old residence, what law governs the validity of the contract, that of the domicile, or of the place where it was consummated? The answer was, the law of the domicile controls. Is not this the identical question we are to answer? These parties resided in New York. They went to Pennsylvania, not to change their residence, but to be married and then to return, which they did. If the *lex domicilii*, and not the *lex loci contractus*, controlled in *Brook* v. *Brook*, it must also govern in the case before us. The mere fact, that in the former case the law of the domicile forbade the marriage on one ground, while in the latter it forbade and made it void on another, does not alter the result, or shake the authority. The great point determined, was, that the *lex domicilii* of marriage follows citizens who go abroad to contract it, contemplating a return, and actually returning. So far, too, as the case shows, *Brook* v. *Brook* did not turn upon the fact, that the law of England pronounced such a marriage as was celebrated in that case, void, if parties went abroad to contract it, in fraud of, and to evade, the English statute, nor does it seem from the case as reported, that the English statute was specially framed to meet such a case; but it was put upon the square ground, that when the home law in general terms declares the marriage void, that law follows the parties, and nullifies the act, when the parties return and resume their actual residence in their original country. It is submitted, then, that this important case covers every question before us, and is so reasonable and sound in its conclusions, that it should be adopted and followed here. No other rule will enable a State to make its own laws of marriage and divorce effectual, and place that relation beyond the legislation of others.

*Brook* v. *Brook*, and the opinion of Lord Chancellor CAMP-BELL, is expressly approved in Story on Conflict of Laws.* In

* 7th edition, section 124.

that work, after stating the rule laid down by the Lord Chancellor, that a foreign marriage is good, if contrary to the non-essentials of the law of the domicile, provided it be in conformity with the regulations of the State where it is contracted, but not good if contrary to the essentials, and declared void by the law of the domicile, though permitted and allowed by the *lex loci contractus*, it is said : " It seems to us that this qualification of the rule, as to the general binding force of the law of the place of celebration of marriage, will enable us to steer clear of most of the embarrassments attending the question; and at the same time to reconcile most, if not all of the conflict in the opinions of the learned jurists upon the subject. And unless this qualification is allowed, there is produced a state of anarchy and confusion upon the subject of this fundamental relation of society, whereby any State, may be compelled to recognize the perfect validity and binding force of polygamous marriages. For polygamy is probably recognized by the law of nature if the majority of the people of the earth are allowed to determine that question by appeal to the past history of the race. And if the practice of the Hebrews were conclusive upon the matter, that will be found to bear in the same direction." It is scarcely necessary to pursue this discussion. We freely admit that learned publicists and reported cases differ. This State, where the question has never been decided, is free to choose the rule, which, in its view, is the sounder in reason, and most conducive to public morals. The effect, necessarily resulting from a counter opinion, requires us to hold that our legislature intended not only to prohibit, but to declare void such a marriage as we have now before us. The later cases and the later editions of Bishop and Story, hold that a State can declare it void. Unless we are prepared to say, that adultery has no effect upon the right of the guilty party again to marry, when divorce has been granted for that sin, and in so holding, to tempt parties to do the act, that they may contract a second marriage, we should adjudge these parties not legally husband and wife, and thus adopt that as the law of all similar cases. It is the alleged wife who makes the point, and she cannot complain if we hold it well taken. If there be innocent parties whom this decision will affect, the law can afford them some redress in other forms. It is better, far better,

that a few should suffer, rather than that a principle should be held which will disturb many a home, and leave many a wife without a husband, whilst he, despite his sin and the forbidding of our laws, is legally married to another, and to him, for a short time at least, a more congenial companion.

Apart, however, from the question discussed, we think that the decision of the Special Term was also right, for the reason there assigned. The plaintiff was forbidden by the judgment of this court, pronounced when divorcing him from his former wife, from contracting a second marriage during her life. That command he has disobeyed, and he now asks the identical court which forbade the act, to absolve him from the very contract which he perfected contrary to its mandate. If he has incurred obligations to another by his disobedience to the court, he should be allowed to relieve himself as best he can. This court has power, as was determined in *Brinkley* v. *Brinkley*, * to prevent any person in contempt from taking " any aggressive proceedings against his adversary ; " it may strike out an answer and thus deprive him of a trial. This plaintiff, confessedly in contempt, takes an aggressive step against another, and founds the right to proceed upon an act which the court had forbidden. If issues, by striking out an answer, may be refused to a defendant who sets at naught the authority of the court, they surely may be to a plaintiff, who, in asking those issues, tells this tribunal that its command is impotent, and its judgment a nullity. I am aware that the question in *Brinkley* v. *Brinkley*, arose out of a proceeding in *that* cause, and that that case does not, in terms, cover one where a party in contempt seeks to bring another suit. It does, however, decide that, even though a party may be authorized by law to bring or defend a suit, his proceedings therein may be stayed if he is in contempt. The statute which gives the right to a suitor in court to bring or defend an action, is the same which authorizes him to proceed in a second. Concede the powers of the court, in any case, to strike out a pleading because of a contempt committed by that party toward the court, and it necessarily follows that the only restraint upon the power of the court toward that party, is the exercise of a sound discretion. No greater authority is exercised in the refusal to allow a

* 47 N. Y., 40.

person in contempt to bring or defend a second suit, than in the refusal to permit the first to proceed or its defense to be heard. The one is as great a violation of an apparent statute right as the other. The penalties of contempts were originally prescribed by the courts, and if a precedent for the power exercised in this case, cannot be found in the records of the past, this court can create one now for this party and this occasion, and thus make a precedent for the future.

It would not, it is fully conceded, be the exercise of a sound judicial discretion, to hold that a party in contempt has no right to bring any action in this court; but whilst conceding this, it is maintained with equal earnestness, that, when a party seeks relief from an act which he has been forbidden to do, the court to which such application is addressed, has a right to withhold the remedy asked. This, we submit, is the exercise of a sound judicial discretion, and is neither arbitrary nor unreasonable. Mr. Marshall had been forbidden by the solemn judgment of this court from contracting a second marriage. This suit is founded upon his disobedience of the command. By it, we are informed that our mandate has been disregarded and our power defied; and, whilst communicating this information, we are told that that which we have forbidden to be done, is valid and legal, despite the forbidding, and that we are compelled to use the power which the law has conferred upon us, to aid him in the offense he has committed. We cannot consent thus to stultify ourselves. We cannot so hold; and we decide that this is a proper case to refuse the relief sought; and we now place such a refusal among the penalties of such contempts, if it never has been before so adjudicated.

The order of the Special Term appealed from, should be affirmed with costs.

Daniels, J. (dissenting):

The importance of the questions discussed in the opinion of Mr. Justice Westbrook, not only justifies, but requires, a statement of the reasons for dissenting from the conclusion maintained by that learned judge. It affects the rights and the validity not only of the plaintiff's marriage, but also that of all others who have solemnized their marriages in other States, after having been pro-

hibited from marrying again during the lifetime of a former husband or wife, by the judgment or decree pronounced by one of the courts of this State. This prohibition follows the statute of the State, and it includes all those cases, and only the cases, where a former marriage may be dissolved by judgment or decree, by reason of the marital criminal misconduct of the party affected by the prohibition. Wherever a marriage may be dissolved by any one of the courts of this State, for the criminal misconduct of one of the parties to it, that party is prohibited from marrying again during the lifetime of the innocent party. A preceding marriage entered into by the plaintiff, was so dissolved by this court, on the application of his innocent wife. And he was prohibited by the judgment entered from marrying again during her life. But notwithstanding that, while continuing to inhabit this State, he contracted another marriage with the defendant, which was solemnized in the State of Pennsylvania ; and to hold him released from its obligations now, would simply reward him for the wrong which he then committed.

It does not appear that the defendant left the State for the solemnization of that marriage, with the design of evading its laws, and doing there what would be plainly unlawful here. And for that reason she must be acquitted from all intentional wrong ; while the effect of holding her marriage void, would simply punish her, and exonerate her criminal husband ; and that is a result, which should not be maintained, unless clearly required by the laws of the State. That the laws require no such severity, by construction, appears very clearly from the provision which has been made upon this subject. For, by that, a second marriage by the guilty party in the preceding action, is not prohibited whenever or wherever contracted ; but the prohibition applies to the subsequent marriage of such party, whenever or wherever the previous marriage may have been solemnized, provided it has been dissolved under the laws of this State. That was the decision made in *Cropsey* v. *Ogden*,[*] and it was all that the court could be then called upon to decide. Whether such a marriage as was solemnized between these parties, was valid and binding within this State, was a point not before the court, and no opinion was expressed upon it.

The statute of this State simply prohibits the guilty party in a

[*] 1 Kernan, 228.

judgment dissolving the marriage into which he or she may have entered, from marrying again during the life of the other party, and then, in general terms, it provides further, that every marriage contract in violation of the prohibition, shall be void. * It does not declare that the marriage of the guilty party, solemnized in another State or country where that can be lawfully done, shall be void; and consequently it cannot include such marriages. For the laws of a State, not rendered specially applicable to acts performed in other States or countries, have no effect beyond the territorial limits of the sovereignty or State enacting them. They are enacted for the government and regulation of the conduct of the citizens and inhabitants of the State enacting them, and apply, when no different intent is manifested, only to acts performed, or to be performed, within its territorial borders. The principle applicable to this subject, is thus stated by a very able modern writer and compiler : " It is equally a necessary result of the independence and distinct sovereignties of the several States, that neither their statutes, or other laws, have any inherent authority, nor are they entitled to any respect extra territorially, or beyond the jurisdiction that enacts them. But by a kind of courtesy or comity between States and nations, the principle is now generally received and adopted, that contracts are to be construed and interpreted according to the laws of the State in which they are made, unless from their tenor, it is perceived that they were entered into with a view to the laws of some other State ; " † and Sedgwick on Statutory and Constitutional Law is to the same effect.‡

For that reason, although the statute declares the marriage of the guilty party, whose former marriage has been dissolved by a decree of divorce, void, its effect should be limited to the case of marriage solemnized in this State. The purpose of the law was to restrain the performance of the act within this State, and not to affect the conduct of its citizens, when they might be in other States, and under, as well as subject to, different laws. To a certain extent, it is true, that this construction must impair the force of the provision contained in the statute, because it allows the prohibition to be lawfully evaded. But that results from the

* 3d R. S., 5th ed., 227, § 4.          † Potter's Dwar. on Statutes, 361.
‡ Pages 69, 71.

circumstance that, by the laws of the place where the act may be performed, it is lawful and valid, and no law has been enacted, prohibiting citizens of this State from availing themselves of the privileges conferred by such laws while they may be within the State maintaining them. All that this State has done, is to prohibit and declare the marriage void, and that is necessarily restricted to acts performed within the territory under its authority. Beyond that, its citizens are not subjected to its restraints, because they are not expressly made so, and their acts are governed by the general principle of law sustaining everywhere contracts that may be lawful and valid in the place where they are entered into, with the limitation that no State will carry into effect any agreement contravening its own code of morals. This principle has repeatedly been applied to marriages, unlawful in the State or country where they have been brought in controversy, but solemnized where the laws imposed no such disability on either of the parties. The general rule is stated by Chancellor KENT, in the following words: "As the law of marriage is a part of the *jus gentium*, the general rule undoubtedly is, that a marriage, valid or void by the law of the place where it is celebrated, is valid or void everywhere." * And he refers to a very early case, decided by the Spiritual Court in England, sustaining that statement of the law. This decision is stated to have been gravely questioned, but it is added that the settled law is now understood to be that which was decided by the Spiritual Court, and that principle is, "that in respect to marriage the *lex loci contractus* prevails over the *lex domicilii*, as being the safer rule and one dictated by just and enlightened views of international jurisprudence."† It is a part of the *jus gentium* of christian Europe, and infinite mischief and confusion would ensue with respect to legitimacy, succession and other rights, if the validity of the marriage contract was not to be tested by the laws of the country where it was made. ‡ The same principle is maintained by Story in his work on the conflict of laws. §

In Massachusetts, the validity of marriages solemnized in other States by its own inhabitants, under circumstances prohibited by

* Kent's Com., 7th ed., vol. 2, 59.      † Id., 60.      ‡ Id., 61.
§ Sections 89, 113, 114, 123.

its own laws, has been made the subject of repeated litigation, and, until the laws were changed by the legislature expressly preventing it from being done, always resulting in maintaining the binding effect of such marriages. It is true that the statutes under which the early cases arose, differed from that of this State, in the omission to declare such marriages void. But that circumstance was not deemed by the courts of any practical importance, for the simple prohibition was held sufficient to render the marriage void, in case it had been solemnized in the State of Massachusetts. On this subject, PARKER, C. J., in delivering the opinion of the court in the earliest leading case, said: "By the law in force here when the marriage in question took place, that marriage could have no legal effect, if it had been celebrated within this then province, because expressly prohibited by law; and although not by the provincial act declared void, yet it was necessarily so, in order to give effect to the law." * This was the case of a marriage between a mulatto and a white woman, residing in Massachusetts, where such a marriage was prohibited, but valid in Rhode Island, where the parties had it solemnized; and it is apparent from it, that, in its decision, the same effect was given to the provincial statute, as it would have had if such a marriage had been actually declared void. In the succeeding case of *West Cambridge* v. *Lexington*, † which, in its circumstances, was like the case now before the court, the marriage was held valid on the same understanding of the effect of a statute simply prohibiting it. The same chief justice, in his opinion, said: "We think it very clear, that, by the laws of this commonwealth, the marriage of the guilty party, after a divorce *a vinculo*, if contracted within this State, would be unlawful and void." ‡ But with that understanding of the effect of the statute prohibiting it, the court held the marriage valid, because it had been solemnized in another State which had enacted no such prohibition; and in *Dickson* v. *Dickson*, § the Supreme Court of Tennessee held the same thing. CATRON, J., in delivering the opinion, said: "Had Mary married a second time in Kentucky, such second marriage would not be void because she continued the wife of Benjamin May, but because such second marriage in

---

* Medway v. Needham, 16 Mass., 157, 159.        † 1 Pick., 505.
‡ Id., 508.                 § 1 Yerg., 110.

that State, would have been in violation of a highly penal law against bigamy, and it being a well settled principle of law, that any contract which violates the penal laws of the country where made, shall be void." But notwithstanding that, as the parties were married in Tennessee, the marriage was held to be a lawful one. It is clear, therefore, that no well founded distinction exists between the laws of this State and those referred to in Massachusetts, which would have warranted the decisions there made, and, at the same time, sanction a different conclusion in the courts of this State.

The principle that the validity of marriage must depend upon the laws of the place in which it may be solemnized, was further maintained in *Putnam* v. *Putnam*, * where the guilty party to a divorce, decreed in Massachusetts, was afterward married in Connecticut. *Sutton* v. *Warren* † and *Clark* v. *Clark* ‡ sustain the same view of the law. The case of *Commonwealth* v. *Hunt* § arose after the statute had been changed so as to declare the subsequent marriage void, but that circumstance was not of itself considered of sufficient importance to change the principle. The section making the change, provided that, " In cases of divorce from the bond of matrimony, the innocent party may marry again as if the other party were dead. Any marriage contracted by the guilty party during the life of the other party, except as provided in the following section, shall be void, and such party shall be adjudged guilty of polygamy." The succeeding section included only cases where the court might give the guilty party leave to marry again. DEWEY, J., in the case last referred to, commenting upon the section just quoted, held that it, in terms, only forbade the guilty party from marrying in that State, and that the adjudicated cases fully sustained the validity of the marriage then before the court, if it had taken place prior to the enactment of a succeeding statute prohibiting parties from marrying in another State to evade the laws of Massachusetts. That provided, that, " When persons resident in this State [Massachusetts], in order to evade the preceding provisions, and with an intention of returning to reside in this State, go into another State or country and there have their marriage solemnized, and afterward return and reside here, the marriage shall be deemed void in this State." After that enactment, it could not be other-

---

* 8 Pick., 433.        † 10 Met., 451.        ‡ 8 Cush., 385.        § 4 Cush., 49.

wise than that the preceding current of authorities should no longer have the force of law in that State. But they are still entitled to weight and consideration in this State, where no such enactment has been made; and the enactment itself is evidence that the legislature understood the marriages referred to as being valid without it, notwithstanding the provision generally declaring all marriages void, to which the guilty party in a decree of divorce might be a party.

The validity of such a marriage, when solemnized in a State different from that simply prohibiting it, was also sustained in *Fuller* v. *Fuller;* * and, in *Simonin* v. *Mallock*, † a marriage solemnized in England between French subjects, was held lawful, although the French courts had pronounced it void for being entered into, in contravention of the laws of that empire. This decision was made before *Wood* v. *Wood* was disposed of, and, though considered, was not disapproved in that case.

In *Ponsford* v. *Johnson*, ‡ the question was presented to the United States Circuit Court, held by Judges NELSON and BETTS, whether a marriage, solemnized in New Jersey between inhabitants of this State, was valid when one of the parties was the guilty party in a preceding decree of divorce. That brought up the precise point now under consideration, and the marriage was held lawful, and the court added further, that the ruling would be the same, even if the parties had both left this State to evade the restraint imposed upon one of them by its laws. The case of *Brook* v. *Brook* § constitutes no exception to the principle now maintained. The marriage there was solemnized in Denmark between British subjects, and it was held void because opposed to the ecclesiastical policy of that kingdom. It was between the former husband and surviving sister of a deceased wife; parties prohibited from intermarrying by the laws of England, and therefore within the exception already mentioned, by which polygamous and incestuous marriages will not be sanctioned even though solemnized in countries whose laws permit them. Lord CAMPBELL, who delivered one of the leading opinions in the case, said, that "it is quite obvious that no civilized

* 40 Alabama, 301, 303, 304.             † 2 Swabey & Tristram, 67.
‡ 2 Blatchford, 51                       § 9 House of Lords Cases, 192.

State can allow its domiciled subjects or citizens, by making a temporary visit to a foreign country, to enter into a contract to be performed in the place of the domicile, if the contract is forbidden by the law of the place of the domicile as contrary to religion or morality, or to any of its fundamental institutions."* And the decision in that case will be found to have proceeded upon this ground, without affecting the stability of the principle from which the marriage in this case derives its support. In that respect it stands upon the same legal principle as *Hyde* v. *Hyde*,† and *Wightman* v. *Wightman*,‡ and which was mentioned in the decision of *Sutton* v. *Warren*. § Where the marriage was solemnized between the plaintiff and defendant, no legal disability appears to have stood in its way. It must therefore be assumed to have been then lawful and binding on the parties, and all the duties and obligations of that relation followed its solemnization. The law of this State did not extend there, and it did not prohibit them from going there for that purpose. And it follows, that when they returned here, that relation accompanied them, with all its duties and obligations.

The plaintiff was clearly in contempt for marrying in violation of the decree to which he was a party, and if he were applying for relief in that action, his disobedience would constitute an answer to his application.║ But no case has been found, holding that, because a party is in contempt in one action, he shall, for that reason, not be at liberty to commence and prosecute another, in no way connected with the one in which the contempt was committed. Such a principle would close the doors of a court of equity to all applications for redress by a party in contempt, of every form, nature and character. So comprehensive a result has not yet been declared nor intimated as a lawful consequence following a party's disobedience of the orders and decrees of courts of equity. The plaintiff's marriage was valid, as already shown, and the defendant, as well as himself, was bound to observe its obligations. If she has so far failed as to entitle him to have the marriage dis-

* Id., 212.                          † 1 Probate and Divorce Cases, 130.
‡ 4 John. Ch., 343.                  § 10 Met., 452.
║ Garstin v. Garstin, 4 Swabey & Trist., 73, 75; Cavendish v. Cavendish, 15 Weekly Reporter, 182.

solved under the laws of the State, he cannot be deprived of that right because he disobeyed a preceding decree, to which she was not a party. The statute has prescribed the causes for which such an action may be maintained, and declared the reasons· for which a divorce may be denied after the defendant's infidelity has been established, and the objection that the plaintiff is in contempt, in some other case to which the defendant is in no way a party, is not among them. This is a statutory remedy to which the plaintiff is entitled upon making a case within the statute. And, as it contains nothing rendering the remedy dependent upon the conduct of the applicant in some other litigation, this court can subject the proceeding to no such qualification.

The general rule upon this subject, has been declared in the following terms : · "It is to be observed, however, that the rule that a party cannot move till he has cleared his contempt, is confined to proceedings in the same cause ; and that a party in contempt for non-obedience to an order in one cause, will not be thereby prevented from making an application to the court in another cause relating to a distinct matter, although the parties to such other cause may be the same; and this privilege has been carried to the extent of allowing a defendant, in each of two creditors' suits to administer the same estate, to move in one of them, in which he was not in contempt, to stay proceedings in the other, in which he was." *

The order should be reversed, and an order entered awarding issues, as moved for by the plaintiff.

DAVIS, P. J. :

I am of opinion that the statute ought to be so construed as to apply to a case where a party resident and domiciled in this State, without any intention of changing his residence, steps across the State line to pass through the ceremony of marriage, intending to return and actually returning to this State and there continuing his residence. At all events the question is one that has not been settled to the contrary in this State, and the most direct way to

* 1 Daniells Ch. Pr., 4th Am. ed., 505; Clark v. Dew, 1 Russ. and Mylne, 103; Taylor v. Taylor, 1 Macnaghten & Gorden, 397; Turner v. Dorgan, 12 Simons, 504.

bring it before the court of last resort is afforded by our affirming the order. I have concluded therefore to concur with my Brother Westbrook.

Order affirmed, with costs.